## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## JONESBORO DIVISION

UNSELD NANCE, SR., individually, as the natural
father and next friend of UNSELD NANCE,
JR.; and PAMELA FARROW[1]                                      PLAINTIFFS

v.                                CASE NO. 3:07-CV-00119 BSM (Lead Case)

ERIK SAMMIS, individually; JIMMY EVANS,
individually; WILLIAM JOHNSON, individually;
ROBERT PAUDERT, individually; CITY OF
WEST MEMPHIS, ARKANSAS; and UNKNOWN
ARKANSAS STATE POLICE OFFICERS, in their
official capacities                                          DEFENDANTS

__CONSOLIDATED WITH:__

DEBORAH FARROW and ROBIN PERKINS,
individually, and as co-administrators of the Estate
of DeAunta Farrow[2]                                          PLAINTIFFS

v.                                CASE NO. 3:07-CV-00189 (Consolidated Case)

ERIK SAMMIS, individually; JIMMY EVANS,
individually; WILLIAM JOHNSON, individually;
ROBERT PAUDERT, individually; THE CITY OF
WEST MEMPHIS, ARKANSAS                                        DEFENDANTS

## ORDER

Presently before the court are the motion for summary judgment filed by separate

defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 38)

and supplement (Doc. No. 82); the motion for summary judgment on the basis of qualified

---

[1] Referred to as the "*Nance* plaintiffs."

[2] Referred to as the "*Farrow* plaintiffs."

immunity filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 40) and supplement (Doc. No. 83); and separate defendant the City of West Memphis's motion for summary judgment (Doc. No. 44) filed in the *Nance* case. Also before the court are the motion for summary judgment filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 75); the motion for summary judgment filed by the City of West Memphis (Doc. No. 78); and the motion for summary judgment on the basis of qualified immunity filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 80) filed in the *Farrow* case. Additionally, the court will consider the individual defendants' motion to exclude testimony of plaintiffs' expert (Doc. No. 87).

## I.  FACTUAL BACKGROUND

Unless otherwise provided, the following facts are undisputed:

On June 22, 2007, Erik Sammis ("Sammis") and Jimmy Evans ("Evans"), police officers with the West Memphis Police Department ("WMPD"), were conducting surveillance in the parking lot of the Steeplechase Apartments. *See* Doc. Nos. 42 and 56 (hereinafter, *Nance* Stmt. of Facts), ¶¶ 2, 5.[3] The surveillance was being performed from a unmarked pickup truck, with Sammis sitting in the driver's seat, and Evans sitting in the

---

[3] In their response to the *Farrow* Statement of Facts (Doc. Nos. 77 and 116, ¶ 5), plaintiffs state that "[w]hether Sammis and Evans were at the location for the reasons stated, whether the events occurred as stated, these are in dispute," and that "it was unreasonable that Sammis and Evans would be surveiling the Flash Market convenience store from the distance and from their location at Steeplechase Apartments."  Plaintiffs, however, provide no support for these assertions.

passenger seat. *Id.* at ¶ 6; Doc. Nos. 77 and 116 (hereinafter, *Farrow* Stmt. of Facts), ¶ 6.

There were five other members of the WMPD on this surveillance team. *Nance* Stmt. of

Facts, ¶¶ 2, 5. Four of the members were in a suburban parked in a different location near

the target of the surveillance. *Id.*

At approximately 10:00 p.m., Sammis and Evans saw two individuals walking in the

direction of the officers' vehicle. *Nance* and *Farrow* Stmts. of Facts at ¶ 7. It was dark out,

and the area was dimly lit. *Id.* at ¶ 8. It was later learned that the two individuals walking

toward the officers' vehicle were DeAunta Farrow ("Farrow"), who was twelve years old,

and Unseld Nance, Jr. ("Nance"), who was fourteen. *Id.* at ¶ 9. Farrow was on the officers'

left, and Nance was on the officers' right. *Id.* at ¶ 10.

Defendants contend, but plaintiffs[4] dispute, that Farrow was holding an object in his

right hand that both officers identified as a handgun. *Id.* at ¶¶ 11-12. Both officers exited

their vehicle to confront Farrow and Nance. *Id.* at ¶ 13. With Sammis on the left and Evans

on the right, the officers approached Farrow and Nance. *Id.* at ¶ 14. Defendants contend that

the officers had their weapons drawn for their protection because they were confronting at

least one apparently armed individual. *Id.* at ¶ 15. Plaintiffs dispute this contention.

Sammis moved toward Farrow, who was on his side, and Evans moved toward Nance,

who was on his side. *Id.* at ¶¶ 16-17. Defendants contend, but plaintiffs dispute, that

Sammis announced that he and Evans were police and ordered Farrow to drop the weapon.

---

[4] Unless otherwise stated, "plaintiffs" refers to both the *Nance* and *Farrow* plaintiffs.

*Id*. at ¶ 18.  Defendants also contend, but plaintiffs dispute, that upon Sammis's order to drop the weapon, Nance immediately got to the ground, but Farrow did not drop the weapon nor did he get to the ground.  *Id*. at ¶ 19.  Defendants further contend that Sammis ordered Farrow to drop the weapon, but Farrow remained standing despite Sammis's repeated commands and Nance's compliance.  *Id*. at ¶¶ 20-21. Plaintiffs dispute that Farrow had a gun, toy or otherwise, or that Farrow heard any commands, if any were given.  *Id*.  The court notes that the *Nance* complaint alleges that defendants Sammis and Evans "simultaneously yelled to the . . . youths to get on the ground and open[ed] fire."  *Nance* complaint, ¶ 38.

Defendants contend, but plaintiffs dispute, that Farrow began raising the object the officers believed to be a handgun and that Sammis feared for his life.  *Nance* and *Farrow* Stmts. of Facts at ¶¶ 22-23.  Defendants also contend, but plaintiffs dispute, that Sammis, sensing a threat, fired two rounds in rapid succession toward Farrow.  *Id*. at ¶ 24.  It is, however, undisputed that two shots hit Farrow and killed him.  *Id*. at ¶ 25.

Sammis directed Evans to handcuff Nance, which he did.  *Id*. at ¶ 26.  Nance was not physically injured and suffered no physical damages.  *Nance* Stmt. of Facts at ¶ 27.  Evans made contact with the WMPD to notify them of the shooting and the injuries to Farrow. *Nance* and *Farrow* Stmts. of Facts at ¶ 28.  The other members of the surveillance team arrived at the scene of the shooting very quickly.  *Id*. at ¶ 29.  Because there was a festival occurring in that area of town, there were other WMPD officers nearby who quickly responded to Evans' call for assistance.  *Id*. at ¶ 30.  When the other WMPD officers arrived,

Evans relinquished control over Nance to the other officers.  *Nance* Stmt. of Facts at ¶ 31.

The defendants contend that Evans maintained control over Nance for not more than ten

minutes; however the *Nance* plaintiffs dispute this contention.  *Id*. at ¶ 32.  Plaintiffs dispute

defendants' contention that Sammis attended to Farrow to assist in his injuries.  *Nance* and

*Farrow* Stmts. of Facts at ¶ 33.

The Arkansas State Police ("ASP") was notified of the shooting and asked to come

and conduct an investigation.  *Nance* Stmt. of Facts at ¶ 34.  That evening, Mike Middleton,

of the ASP, conducted a videotaped interview of Nance, and Nance signed a statement about

the shooting.  *Nance* Stmt. of Facts at ¶ 35; *Farrow* Stmt. of Facts at ¶ 32.  Plaintiffs contend

that the statement was not a verbatim record of the interview and that only the videotape

reflects the verbatim statements of Nance.  *Id*.  Plaintiffs dispute defendants' contention that

during the interview and in his signed statement, Nance stated that Farrow had a toy gun in

his right hand, which was partially raised, when he was shot.  *Id*. at ¶ 36. The *Nance*

plaintiffs do not dispute that a toy gun, similar to a semi-automatic handgun, was discovered

near Farrow's body.  The *Farrow* plaintiffs, however, argue that Nance, in his deposition,

stated that the toy gun was in the waistband of Farrow's pants.  *Nance* Stmt. of Facts at ¶¶

37-38; Farrow Stmts. of Facts at ¶ 33.  The *Farrow* plaintiffs also state that "[i]t was self-

serving to Sammis to find the toy gun outside the waistband of DeAunta Farrow, and as such,

it is a disputed fact question for the jury."  *Farrow* Stmt. of Facts at ¶ 34.  The toy gun was

taken into evidence by the WMPD and is in the possession of the ASP. *Nance* Stmt. of Facts at ¶ 39; *Farrow* Stmt. of Facts at ¶ 36.

While the *Nance* plaintiffs admit that none of the separate defendants intended to inflict emotional distress on any of the plaintiffs, the *Farrow* plaintiffs contend that "the customs, policies and procedures of the West Memphis Police Department resulted in the harm and the emotional distress suffered by the Plaintiffs." *Nance* Stmt. of Facts at ¶ 40; *Farrow* Stmt. of Facts at ¶ 37. The *Nance* plaintiffs admit that, aside from the initial command by Sammis to handcuff Nance, none of the separate defendants directed the detention of Nance after the other WMPD officers arrived on the scene. *Nance* Stmt. of Facts at ¶ 41. The *Nance* plaintiffs also admit that neither Robert Paudert, Chief of the WMPD, nor William Johnson, Mayor of West Memphis, directed the actions of Sammis and Evans on the evening of June 22, 2007. *Nance* Stmt. of Facts at ¶¶ 3-4, 42-43. The *Farrow* plaintiffs, however, contend that the customs, policies, and procedures of the WMPD put in place by Paudert guided the actions of Sammis and Evans that night. *Farrow* Stmt. of Facts at ¶¶ 38-39.

None of the separate defendants directed the conduct of the officers who transported Nance to the WMPD, as requested by the ASP, nor did they direct the actions of the officers responsible for the place where Nance was held before being interviewed by the ASP. *Nance* Stmt. of Facts at ¶¶ 44-45. Defendants contend, but the *Nance* plaintiffs dispute, that none of the separate defendants prevented Nance from communicating with his parents. *Id*. at ¶

46.   Unseld Nance, Jr., and his father, Unseld Nance, Sr., admit that they were never threatened.  *Id*. at ¶ 47.

Although the *Nance* plaintiffs dispute that on June 22, 2007, Sammis had 3200 hours of police training, including 1000 hours of training on the use of deadly force, the *Farrow* plaintiffs do not dispute this assertion.  *Id*. at ¶ 48; *Farrow* Stmt. of Facts at ¶ 40.  Sammis has never been fired from any job for use of excessive force, but the *Farrow* plaintiffs contend that this is only because the WMPD has been deliberately indifferent to numerous citizen complaints.[5]  *Nance* Stmt. of Facts at ¶ 49; *Farrow* Stmt. of Facts at ¶ 41.  On June 22, 2007, Evans had 687 hours of police training, including training on the use of deadly force, but the *Farrow* plaintiffs state that a significant portion of the training was conducted by Sammis.  *Nance* Stmt. of Facts at ¶ 50; *Farrow* Stmt. of Facts at ¶ 42.

Sammis was hired before Chief Paudert became police chief, and therefore, Paudert did not hire Sammis.  *Nance* Stmt. of Facts at ¶ 51; *Farrow* Stmt. of Facts at ¶ 43.  Although the *Nance* plaintiffs admit that Paudert properly investigated any and all allegations of wrongdoing by Sammis and Evans, and all other officers of the WMPD related to the allegations in this case, the *Farrow* plaintiffs dispute that Paudert properly investigated allegations against Sammis.  *Nance* Stmt. of Facts at ¶ 54; *Farrow* Stmt. of Facts at ¶ 46.  Neither Johnson nor Paudert is provided information related to every discipline within the

---

[5]  The *Farrow* plaintiffs failed to provide the pages of Sammis's deposition relied upon in support of their denial.

WMPD, nor must they personally approve all discipline at the WMPD. *Nance* Stmt. of Facts at ¶¶ 57-59; *Farrow* Stmt. of Facts at ¶¶ 50-51.

Although the *Nance* plaintiffs admit that none of the separate defendants' material actions alleged in this case were motivated by racial animus or other unconstitutional motives, the *Farrow* plaintiffs state that this is a jury question. *Nance* Stmt. of Facts at ¶ 57; *Farrow* Stmt. of Facts at ¶ 49. While the *Nance* plaintiffs admit that the WMPD has an internal investigation unit that responds to citizens' complaints of alleged misconduct and investigates those allegations, the *Farrow* plaintiffs dispute this contention. *Nance* Stmt. of Facts at ¶ 59; *Farrow* Stmt. of Facts at ¶ 52

## II.  PROCEDURAL BACKGROUND

On September 4, 2007, the *Nance* plaintiffs filed their complaint pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988 for violation of their rights under the First, Fourth, and Fourteenth Amendments, including violations of the right to familial relations and equal protection. The *Nance* plaintiffs also assert violations of the Arkansas Civil Rights Act, wrongful detention, unlawful arrest, unreasonable seizure, unlawful search, assault and battery, false imprisonment, intentional infliction of emotional distress, gross negligence, and negligence. The case was initially assigned to United States District Judge William R. Wilson, Jr.

On December 10, 2007, the *Farrow* plaintiffs filed their complaint pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, and 1988 for violation of their rights under the Fourth and

Fourteenth Amendments, including violations of the right to familial relations and equal protection. The *Farrow* plaintiffs also assert violations of the Arkansas Civil Rights Act, wrongful death, false arrest, false seizure, assault and battery, gross negligence, and negligence.[6] The case was initially assigned to United States District Court Judge J. Leon Holmes.

On February 25, 2008, Judge Holmes denied defendants' motion to dismiss the official capacity claims as redundant in the *Farrow* case. On February 26, 2008, however, Judge Wilson dismissed the official capacity claims against defendants Sammis, Evans, Johnson, and Paudert as redundant in the *Nance* case. On April 23, 2008, the *Nance* case was transferred to the undersigned. Subsequently, the undersigned dismissed the official capacity claims in the *Farrow* case for consistency.

On August 28, 2008, defendants filed motions for summary judgment in the *Nance* case. The same day, plaintiffs moved to consolidate the *Nance* and *Farrow* cases. On September 22, 2008, the undersigned granted the motion to consolidate the *Nance* and *Farrow* cases over the objection of defendants. Therein, the court stated that it would hold the pending summary judgment motions in abeyance and would allow supplemental briefing by the parties upon the conclusion of discovery, and therefore, plaintiffs' Rule 56(f) claims were moot. On December 19, 2008, defendants filed motions for summary judgment in the

---

[6] Although the *Farrow* plaintiffs initially named the Steeple Chase Apartments as a defendant, Judge Holmes dismissed that defendant on August 18, 2008, upon the *Farrow* plaintiffs' motion.

*Farrow* case, as well as supplements in the *Nance* case and a motion to exclude. Plaintiffs have responded to the outstanding motions. Trial is set for the week of February 17, 2009, in Jonesboro, Arkansas.

### III.  MOTION TO EXCLUDE (Doc. No. 87)

The individual capacity defendants Sammis, Evans, Johnson, and Paudert ("individual defendants") move this court to exclude the testimony of plaintiffs' proposed expert, Walter Winfrey. The individual defendants assert that Winfrey's testimony should be excluded because plaintiffs failed to provide the necessary disclosures under Rule 26(a)(2), and that they should be awarded the fees, costs, and expenses of the deposition. The individual defendants state that counsel for plaintiffs have informally given notice that they intend to call Winfrey to testify about the use of force matters relevant to this case, yet have failed to comply with Federal Rule of Civil Procedure 26(a)(2) regarding the disclosure of expert testimony.

In response, plaintiffs admit that the "disclosure contemplated by Rule 26(a)(2) regarding the disclosure of expert witness testimony was lacking, however, that is primarily because Winfrey was asked to opine about reasonableness." They state that defendants' deposition of Winfrey "explored every possible police concept, and they are completely aware of his opinions, notwithstanding that all such opinions were not in his report." Plaintiffs assert that the award of fees, costs, and expenses is inappropriate because defendants would have deposed Winfrey regardless of the level of detail of the report.

Alternatively, the individual defendants assert that the testimony is neither reliable nor helpful to the jury. They assert that Winfrey is not qualified as an expert in the use of force because he has never testified in state or federal court as a retained expert witness, has never been retained as an expert witness prior to this case, and has never taught any classes dealing with deadly force. Exhibit D, Winfrey Dep. p. 6-7, 40, Individual Defendants' Motion to Exclude (Doc. No. 87) ("Mot. to Exclude"). The individual defendants state that Winfrey incorrectly believes that the appropriate standard for the use of force is that the officer must exhaust all reasonable means before resorting to deadly force.

In his deposition, Winfrey agreed that he believes that the "standard that applies in this case" is "that Sergeant Sammis did not exhaust all reasonable means before he used deadly force." *Id*. at 29. When asked to explain the constitutional standard for the use of deadly force, Winfrey stated:

> I would think that most police agencies write their own policy as it relates to deadly force, and I don't know if they all compatible with each other, but I think deadly force, whatever policy and how it addressed deadly force, of course, there would be procedures to make every effort to apprehend or diffuse the situation, and, of course, deadly force would be the last effort, and I think the constitution would say before you can revert to deadly force that you would have to be able to articulate that you were placed -- you or someone else's life were in imminent danger.

Exhibit D, Winfrey Dep. p. 7, Mot. to Exclude.

The individual defendants also state that Winfrey's testimony does not satisfy the three-part standard set forth in Federal Rule of Evidence 702. First, they assert that his testimony is not based upon sufficient facts or data because he only reviewed the Arkansas

State Police investigative file, visited the scene and convenience store involved in the case while accompanied by plaintiffs' attorney, and reviewed the depositions of Sammis and Evans. Second, they assert that Winfrey's opinions are not based upon reliable principles and methods because he based his opinions on his experience as a police officer and, in part, on the medical examiner's determination that the incident was a homicide, although he could not say why experts rely upon this type of information. Third, the individual defendants assert that Winfrey's opinions are not the result of the application of reliable principals and methods to the facts, but are simply subjective statements and speculation. Specifically, the individual defendants assert that Winfrey's sole opinion in this case is that the officers should have turned on their blue lights to make their presence known, rather than exiting their vehicles and verbally making contact with the subjects, but that this has nothing to do with the use of deadly force in this case. They assert that Winfrey offers no alternate course of action at the moment of the shooting, and refused to answer a hypothetical based upon the defendants' version of the facts regarding the reasonableness of using deadly force.

In his amended report, Winfrey opines as follows:

> After review of all relevant material, my professional assessment of the matter is that: (1) that the officers were involved in an "alleged sting" concerning a possible convenience store robbery. However, the officers were not parked adjacent nor in close proximity to the area of their alleged surveillance. For whatever reason, the officers were instead parked in an unmarked, unidentifiable pick-up truck (undercover vehicle) three (3) blocks from the alleged "sting" of the convenience store robbery in a public housing community. (2) It is obvious that the officers were attempting to await "anything" they visualized as criminal activity in the public housing community.

12

Along come two youth, unaware of their alleged "sting," walking in their own community. They did not know who was in the unidentified pickup truck parked by the Dempsey Dumpster. These children obviously had no knowledge that the pickup truck was occupied by two police officers and therefore posed no threat to the officers.

The officers were not in any imminent danger. But instead the officers created a hostile environment by exiting their unmarked, unidentified vehicle and advancing on the two children. The officers created, escalated, and then began a chain of unnecessary events that were clearly preventable which eventually led to the death of DeAunta Farrow.

Any prudent and professionally trained officer, including Sgt. Eric Sammis and Officer Jimmy Evans, should have assessed the situation immediately and with absolute and due certainty realized that they were in no imminent danger. Though it is alleged the children were in possession of a "toy gun", the children at no time placed the officers in any imminent danger.

Through the use of the blue light, without even exiting the unmarked undercover vehicle (pickup truck), the officers could have prevented the entire situation.

Instead Sgt. Eric Sammis, in his professional opinion, while on stake-out at a possible convenience store robbery three blocks away felt he was in such grave imminent danger that he exited his undercover vehicle, pulled his weapon and shot a child in his own community at an acceptable hour for children to be outside.

In conclusion, after reviewing all relevant material afforded to me, it is my professional assessment that Sergeant Sammis did not exhaust all reasonable means before he used deadly force in this matter. Moreover, the Arkansas Medical Examiner has ruled this shooting as a Homicide.

Exhibit B, Amended Report, Mot. to Exclude. When asked to give the version of the facts

that he was relying upon in giving his opinions, Winfrey testified, "I feel like that I can read

a report and come to some kind of logical conclusion as to what happened, and that's based

on my experience as a police officer for 30 some years." *Id.* at 35.

13

Also, in his deposition, Mr. Winfrey was given the following hypothetical:

Two officers encounter two individuals, one which the officers believed to
have a weapon, the officers exit their vehicles and give verbal commands to
the two subjects, one of which complies with the command and gets on the
ground, the other of which does not comply with the command and begins
raising his hands that hold a weapon or what they believe to be a weapon in the
direction of the officers, what should the officer do in that situation?

*Id*. at 36-37.  In response, Mr. Winfrey stated, "That's an individual judgment call.  All

officers don't respond the same way.  So there's no way for me to put myself in that because

I wasn't there. . . . I don't think there's a set of exact procedures that all police officers will

use under that hypothetical situation."  *Id*. at 37.  He stated that he could not give any

examples of what a "reasonable response to that set of facts would be."  *Id*.

Plaintiffs assert that Winfrey is imminently qualified to act as an expert because

throughout his thirty-one years at the Memphis Police Department, he has held every position

in a major city police department, including Chief of Police, with more than 1800 police

officers.  They state that Winfrey was retained to investigate and form an opinion as to

whether the actions of Sammis and Evans were reasonable based on the totality of the

circumstances.

Although plaintiffs clearly failed to comply with Rule 26(a)(2), the court will not

exclude the expert testimony on this basis.  Further, the court declines  to award the costs of

the deposition, as the deposition would likely have been taken regardless of compliance with

Rule 26.  As to the objections raised by defendants, Federal Rule of Evidence 702 provides:

14

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 was amended in 2000 in response the holdings in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  *See* Fed. R. Evid. 702 advisory committee's note.  The 2000 Advisory Committee's note states that trial judges have the responsibility of acting as gatekeepers to exclude unreliable expert testimony.  *Id*.  A trial court is to consider factors such as:

> (1) whether the expert's technique or theory can be or has been tested---that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
>
> (2) whether the technique or theory has been subject to peer review and publication;
>
> (3) the known or potential rate of error of the technique or theory when applied;
>
> (4) the existence and maintenance of standards and controls;
>
> (5) whether the technique or theory has been generally accepted in the scientific community;
>
> (6) whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;"

(7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(8) whether the expert has adequately accounted for obvious alternative explanations;

(9) whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting;" and

(10) whether the field of expertise claimed by the expert is known to reach reliable result for the type of opinion the expert would give.

*Id*. The Advisory Committee's note also explains that the terms "principles" and "methods" when applied to technical or other specialized knowledge may encompass the application of extensive experience to analyze the facts presented. *Id.* If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Id.*

Although "doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility," the court "must ensure that the testimony admitted under Rule 702 is both relevant and reliable." *Miles v. General Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001) (internal quotations omitted). "[E]xpert testimony not only is unnecessary but indeed may properly be excluded in the discretion of the trial judge 'if all the primary facts can be accurately and intelligibly described to the jury, and if they, as men of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training,

experience, or observation in respect of the subject under investigation.'" *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962). Rule 702 "does not rank academic training over demonstrated practical experience," as "an individual can qualify as an expert where he possesses sufficient knowledge gained from practical experience, even though he may lack academic qualifications in the particular field of expertise." *Fox v. Dannenberg*, 906 F.2d 1253, 1256 (8th Cir. 1990) (internal citation omitted).

Although it is clear that Winfrey has extensive experience in law enforcement, the central question is whether the use of force by the officers was reasonable under the specific circumstances of this case. While Winfrey's training and experience might qualify him to testify as an expert in another case with a different set of facts, the court finds that his testimony would not be helpful in this case because it is not needed to help the jury to decide whether the officers' actions were reasonable. This is true because the facts of this case are not technical and can be accurately and intelligibly described to the jury by the fact witnesses. *See Salem*, 370 U.S. at 35.

The court also finds that Winfrey's testimony does not meet the standard set forth in Federal Rule of Evidence 702. Indeed, most of Winfrey's report focuses on the events leading up to the confrontation between the officers and Nance and Farrow. Other than writing that the officers should have turned on their blue lights, he offers no alternate course of action that the officers should have taken at the time of the shooting. More importantly, when offered a simple hypothetical regarding the reasonableness of using deadly force under

a set of facts identical to defendants' version of the events,  Winfrey could not answer the question.

For the reasons set forth above, Walter Winfrey is precluded from testifying as an expert witness.

## IV.  SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P.

56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## V.  DISCUSSION

In their motions for summary judgment, defendants assert that summary judgment is appropriate because they are entitled to qualified immunity.  Additionally, defendants assert that they engaged in no conduct resulting in the violation of plaintiffs' constitutional rights and that plaintiffs cannot establish their liability.

**A.**     **Motion for Summary Judgment (Doc. No. 38) and Supplement (Doc. No. 82); Motion for Summary Judgment on the Basis of Qualified Immunity (Doc No. 40) and Supplement (Doc. No. 83); Motion for Summary Judgment (Doc. No. 75); and Motion for Summary Judgment on the Basis of Qualified Immunity (Doc. No. 80)**

Section 1983 provides a cause of action against government officials who deprive persons of "rights, privileges, or immunities secured by the Constitution."  *Nelson*, 533 F.3d at 961 (citing 42 U.S.C. § 1983).  "Government officials are entitled to a dismissal 'if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Id*. at 961-62 (citing *Sanders v. City of Minneapolis, Minn.,* 474 F.3d 523, 526 (8th Cir. 2007)).

In considering whether an officer is entitled to qualified immunity, the court determines whether the allegations amount to a constitutional violation, and whether that

right was clearly established." *Id*. at 962.  "Qualified immunity is not just a defense to liability, it constitutes immunity from suit." *Id*.  Qualified immunity is a question of law for the court. *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir. 2007).  "Whether an official is entitled to qualified immunity depends upon the objective legal reasonableness of the official's actions assessed in light of the legal rules that were clearly established at the time of the actions in question." *Id*. (citing *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)) (internal quotation marks omitted).

If either the allegations and undisputed facts do not amount to a constitutional violation, or the right was not clearly established, the officer is entitled to qualified immunity. *Pearson v. Callahan*, No. 07-751, 2009 WL 128768, *9 (U.S. Jan. 21, 2009) (holding that the sequence of the *Saucier* two-part test is no longer mandatory).  "To withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated [the] plaintiff's clearly established right." *Goff v. Bise*, 173 F.3d 1068, 1072 (8th Cir. 1999).

### 1. Excessive Force and Unlawful Initial Detention/Arrest Claims by Farrow and Nance against Sammis and Evans

"*[A]ll* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v.*

*Conner*, 490 U.S. 386, 395 (1989).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983))).

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.*  Proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.*  "The calculus of reasonableness must embody allowance for the fact that the police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

"As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation." *Id.* at 397. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.*

"Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Garner*, 471 U.S. at 7. "A police officer may arrest a person if he has probable cause to believe that person committed a crime." *Id.* "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Id.* at 11. It is constitutionally permissible for an officer to use deadly force "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Id.* Thus, if the suspect threatens the officer with a weapon . . ., deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11-12.

"The law distinguishes between a seizure and a stop." *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (citing *Terry v. Ohio,* 392 U.S. 1, 10 (1968)). "While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone." *Id.* "There is no 'neat set of legal rules' that governs the determination whether the police had reasonable suspicion." *Id.* (quoting *United States v. Barker,* 437 F.3d 787, 789 (8th Cir. 2006)). "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a

22

rational inference that a crime is being or has been committed.'" *Id*. (quoting *United States v. Hernandez-Hernandez,* 327 F.3d 703, 706 (8th Cir. 2003)).  "But reasonable suspicion is more than an inarticulable hunch, it must instead be based on specific and articuable facts, which taken together with rational inferences, support the stop." *Id*.  In determining whether the police had reasonable suspicion, the court examines the totality of the circumstances "through the eyes of the officers, because they are trained to cull significance from behavior that would appear innocent to the untrained observer." *Id*. (quoting *Barker,* 437 F.3d at 790).

"A detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention." *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005).  In determining whether a period of time is excessive, the court must consider the "law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id*. (quoting *United States v. Sharpe,* 470 U.S. 675, 685 (1985)).  "In assessing the effect of the length of the detention, [the court must] take into account whether the police diligently pursue their investigation." *Id*. at 557 (citing *Sharpe,* 470 U.S. at 685 (quoting *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983))).

First, viewing the evidence in the light most favorable to plaintiffs, the court must determine whether the defendants' conduct violated a constitutional right. *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008).  Here, it is alleged that defendants Sammis and Evans pointed their weapons at Nance and Farrow, shot in the direction of Nance and Farrow (with

two fatal shots striking Farrow), and that upon Sammis' order that Evans handcuff Nance, Evans placed handcuffs on Nance.

The crucial determination in this case is whether defendant Sammis' belief that Farrow posed a threat of serious physical harm to him was objectively reasonable, which turns in large part on whether Farrow, in fact, held a toy gun in his hand that could be mistaken for a real gun and raised it toward Sammis.  If so, defendants Sammis and Evans are likely entitled to qualified immunity.  *See Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (citing *Boyd v. Baeppler,* 215 F.3d 594, 604 (6th Cir. 2000) (upholding qualified immunity for police officers who used deadly force against a suspect who had a gun in his hand and who pointed it at officers and others); *Bell v. City of East Cleveland,* No. 96-3801, 1997 WL 640116, at *3 (6th Cir. Oct. 14, 1997) (upholding qualified immunity for a police officer who shot and killed a boy who pointed a toy gun at the officer); *Rhodes v. McDannel,* 945 F.2d 117, 120 (6th Cir. 1991) (upholding qualified immunity for police officer who shot and killed a homeowner who approached police officers with a raised machete in his hand and ignored repeated warnings to drop the weapon), *cert. denied,* 502 U.S. 1032, 112 S.Ct. 872, 116 L.Ed.2d 777 (1992)).

During the recorded interview of Nance at approximately 12:30 a.m. on June 23, 2007, by Mike Middleton of the ASP, Nance gave the following account of the events that evening:

Q.      Okay.  Unseld, what happened this afternoon, this - - or tonight?

A.      We were walking - -

Q.      You said we.  What's - - what's the young man's name?

A.      DeAunta.

. . .

Q.      Okay.  And what did you see when y'all were walking?

A.      Two people got out of the car and pointed guns.

Q.      Okay.  Could - - could you tell what they looked like?

A.      Couldn't see that, back that far away.

Q.      Could you tell how they were dressed?

A.      They had like camouflage pants at the time.

Q.      What type of guns did you see?

A.      We couldn't see anything.

Q.      Couldn't see them holding anything?

A.      Well, flashlights.

Q.      Flashlight?  Okay.  Did they tell you anything?  Or tell DeAunta anything?

A.      They told us to get on the ground.  They told him to put the gun down.

Q.      Did they say who they were?

A.      Uh-uh.

Q.      Who did you think they were when they were telling you all to get on the ground.

A.      I thought they was people playing.

Q.      And what did DeAunta do with the gun?

A.      I wasn't looking at him.

Q.      You were - - oh, you weren't looking at him?

A.      I was on the ground.

Q.      Okay.  So you obeyed what they told you to do?  You got on the ground.  And you didn't see what DeAunta was doing?

A.      Uh-uh.

Q.      Okay.  Then what did you hear or see next?

A.      A gunshot.

Q.      How many shots did you hear?

A.      One.

Q.      Did you - - when the man told you to get down, did you think they were police officers or - -

A.      I thought they were police officers.

Q.      Is that why you obeyed them?  Okay.  Did you hear them say police or - -

A.      Uh-uh.  They just said get on the ground.

Q.      But you thought for some reason they were policemen?  Did you see something on their uniforms to indicate that?  Badge?  Patch?

A.      Uh-uh.

. . .

Q.      Okay.  What happened after you heard the gunshot?

A.      He was just laying on the ground.

Q.      What did you do then?

A.      I was - -

Q.      Were you still laying on the ground?  Okay.  What did the officers tell you then?  What did you hear or see then?

A.      They told them they needed an ambulance.

Q.      Were they on the radio calling for help or - -

A.      Yeah.

Q.      Where did you go after that?  Did they keep you there or - -

A.      They kept me there and put handcuffs on me and put me inside of a police car.

Q.      Okay.  What type of gun did DeAunta have?

A.      A black gun.

Q.      Well, did it shoot anything?

A.      Uh-uh.

. . .

Q.      Was it dark when this happened?

A.      Yes.

. . .

Q.      Had he been walking with it in his hand or - -

A.      Mm-hmm.  In his hand, he was trying to cover it up.

Q.      So as y'all were walking he had it in his hand but - -

A.      He was trying to cover it up.

Q.      Why was he trying to cover it up?

A.      When we were walking he put it - - he had it tucked like this.

. . .

Q.      Did you ever see him pointing at anybody with the gun or anything?

A.      No.

. . .

Q.      Can you stand up and show this investigator and I how he was carrying the gun?  Stand up and show us how he was walking with the gun.

A.      He had the gun like this.  And he had the black park showing.

. . .

Q.      The handle was showing?  The barrel was tucked in under his shirt?

A.      He had it like this.

Q.      But when these - - these men gave you all a command to get on the ground and they also gave a command for him to do what with the gun?

A.      Put it on the ground.  And he had his hands up like this and the gun was pointed down.

Q.      So he had the gun in his right hand?

A.      Right hand.

Q.      But you were laying down.  And which way were you looking when you were laying?

A.      This way.

Q.      Looking back?

A.      I was looking that way.

Q.      Which side was he from you?

A.      He was on this side.

Q.      He was on your left side?  Okay.

A.      Facing forward when they shot the gun.

. . .

Q.     Do what, son?  I didn't hear you.

A.     I had looked forward, that's - - when the person shot the gun.

. . .

Q.     So at that moment you were looking forward.  Did you see him shoot the gun?

A.     Uh-uh.  I just heard it.

Q.     Were you looking towards the officer, the man - -

A.     I was looking towards the tree.

. . .

Q.     What did you hear the officers say?

A.     Get on the ground and drop the gun.

. . .

Q.     And do you know what - - did you see what he did during that time or you just - - you immediately went on the ground?

A.     I was down on the ground and he was - - had his hands like this - -

Q.     Okay.

A.     - - and the gun was facing down.

Q.     But when he was walking down the street, you said he had it underneath his - - carrying it underneath his shirt like this?

A.     Mm-hmm.  He had it underneath.

Q.     Okay.

. . .

Q.     You said earlier that you got on the ground.  As they said - - as they commanded you or told you to and you said that you felt that they were police, what made you think that they were police?

A.     They were yelling.

. . .

Q.     Could you hear them say police, get down, or you just don't remember?

A.     They didn't say police.

. . .

*See* Attachments to Exhibit 5, Middleton's Aff., Defendants' Motions for Summary

Judgment (Doc. Nos. 38, 40, 75, 80) ("Defs.' Motions").  The court notes that it did not have

the benefit of viewing the videotape of Nance's interview at the police station, which would

likely clarify some statements made during said interview.  The interview concluded at 1:07

a.m.  *Id*.

At the conclusion of the interview, the officer provided Nance with a handwritten

statement purporting to summarize Nance's statement, which states in pertinent part:

> We were going back to Candace's house to get my cell phone.  De[A]unta
> brought a toy pistol[.] [I]t was gray black handle it had a orange thing on it.
> De[A]unta was carrying with his right hand as we walked it was under his shirt
> with the handle showing.  We saw 2 men get out of a black pickup truck by a
> dumpster they had two flashlights.  Then one of them said get on the ground.
> I got on the ground De[A]unta was standing.  His arms were partially raised
> up the toy gun was in his right hand.  I was looking straight and didn't see the
> men.  They said drop the gun.  De[A]unta was fixing to get on the ground
> when they shot.  I got down as they said I felt that they were Police because
> they were yelling.  I heard a shot[.] I didn't see De[A]unta fall.  I looked back
> and he was on the ground.
>
> They called for an ambulance.  One of them told the other to put the handcuffs
> on me.  Another Police Officer brought me down to the Police Station.

*Id*.

During his deposition, Nance testified as follows:

> Q.    And finally, during the statement that you provided to the police, did he
>       tell you - - the statement that you signed rather, this Exhibit Number 2,
>       the officer wrote the statement, did he not?
>
> A.    Yes, he wrote it.

29

Q.      Okay.   Did he change anything of what you said in your original statement to him?  Did you tell the officer that De[A]unta was carrying with his right hand as we walked, did you tell him that?

A.      Yes.

Q.      You did?

A.      Yes.

Q.      Okay.  Did you also tell him that the - - it was under his shirt with the handle showing?

A.      Yes.

Q.      And when you say in the statement it was under his shirt with the handle showing, were you talking about the gun?  Were you talking about the toy gun?

A.      Yes.

Q.      And when you said it was under his shirt with the handle showing, was that - - was this toy gun under his shirt with the handle showing at the time that Officer Sammis shot your cousin?

A.      No.

Q.      It wasn't?

A.      No.

Q.      Where was it at?

A.      It was - - it was tucked in his pants.

Q.      Okay.  That's what I'm saying.  It was tucked in his pants.  So at the time that Officer Sammis shot your cousin De[A]unta Farrow, this statement is correct it was under his shirt with the handle showing; is that correct?

A.      Yes.

Exhibit 3, Nance Dep. p. 49-50, *Nance* Plaintiffs' Amended Response. (Doc. No. 57) ("Pltfs.' Am. Resp."); Nance Dep. p. 50, *Farrow* Response (Doc. No. 116) ("*Farrow* Resp.").

During his deposition, Sammis testified that while sitting in the truck, he saw two individuals walking, and stated to Evans, "Jimmy, he's got a gun in his hand." Exhibit 12, Sammis Dep. p. 97, Defs.' Motions. After Evans confirmed this, Sammis stated, "we've got to go," and they exited the truck drawing their weapons. *Id*. Sammis testified that he began screaming "police, drop the gun," as they were moving forward toward the two individuals. *Id*. at 98. Sammis testified that Nance went to the ground immediately, and Farrow stopped. *Id*. Sammis also testified that Farrow started to raise the gun, and he yelled again, "drop the gun." *Id*. As Farrow "started to come up," Sammis testified that he yelled "no," and fired two rounds fairly quickly "because that gun kept coming out to the center." *Id*. During his deposition, Evans confirmed that as Sammis yelled no, Farrow was raising his arm. Exhibit 12, Evans Dep. p. 48, Defs.' Motions. In his affidavit, Sammis states that he "reasonably believed that Farrow's action posed an immediate threat and [he] feared for [his] life when Farrow raised the gun, so [he] fired two shots in rapid succession." Exhibit 3, Sammis Aff. ¶ 10, Defs.' Motions.

The *Farrow* plaintiffs submit the deposition of Dr. Daniel Konzelman, the medical examiner in this case, asserting that Dr. Konzelman stated that it would be a very odd position for the decedent to appear to be firing his weapon at Sammis based on the trajectory of the bullet wounds suffered by DeAunta Farrow. Dr. Konzelman testified as follows:

> Q: Now, as you've already stated, the wound to the chest, the bullet that went into the chest came out the side of the torso and entered into the upper arm of DeAunt[a] Farrow; is that correct, sir?

31

. . .

A: It appeared to re-enter the upper arm, yes.

Q: Okay.  And when that occurred -- could that have occurred if DeAunt[a] Farrow's arms were up in front of him as I am performing now?

A.: The left arm would appear to have not been in that position.

. . .

Q:  If my arms were directly out in front of me, fully extended, or above my head, fully extended, is it likely that the bullet would have entered the upper arm as it did?

A: If the left arm was extended, as well as the right, no, I don't believe that that would be the right angle.  However, what the left arm is doing, in this case, is all that I know.  I do not know what the right arm was doing.

Konzelman Dep. pp.53-54, Farrow Brief (Doc. No. 100).

Sammis testified that as Farrow went down, he could see that Farrow did not have anything in his left hand, but his right hand was underneath him, which concerned him. Exhibit 12, Sammis Dep. p. 99, Defs.' Motions.   Sammis instructed Evans to handcuff Nance.  *Id*.  Sammis testified that as he approached Farrow, he asked if he was hit and where the gun was, and Farrow stated, "yes, it's a toy gun."  *Id*.  As Sammis lifted Farrow's left shoulder up, he saw "the handle, the butt of this gun, underneath his waistline."  *Id*. at 99-100.

Sammis testified that he did not see Nance commit any criminal violation, but states that he "had a legitimate reason to handcuff him."  Exhibit B, Sammis Dep. p. 110, Brief in Support of Response to Motion for Qualified Immunity (Doc. No. 52) ("Pltfs.' Resp.").  He stated, "If I encounter somebody with a gun and he's with somebody, I am going to detain

that individual to make sure he doesn't have a gun, too.  Granted, we didn't see it in his hands, but that's not saying he didn't have it in his belt."  *Id*.

Here, there are genuine issues of material fact as to whether Farrow held a toy gun in his hand that could be mistaken for a real gun and raised it toward Sammis, or if the toy gun was "tucked in" Farrow's pants at the time Sammis fired his weapon.  Although Nance's version of the events is not entirely clear, taking the facts in a light most favorable to plaintiffs, the court must assume that the toy gun was "tucked in" Farrow's pants at the time Sammis fired his weapon.  It is unclear whether Nance contends that the handle of the gun was showing at the time Sammis fired his weapon.  Thus, Sammis and Evans are not entitled to qualified immunity as to the excessive force and unlawful initial detention/arrest claims, at this point, because genuine issues of material fact exist.

The court must also consider "whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted."  *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008).  "This second step is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id*. (quoting *Samuelson v. City of New Ulm,* 455 F.3d 871, 875 (8th Cir. 2006) (internal quotations omitted)).  "The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person."  *Guite v. Wright,* 147 F.3d 747, 750 (8th Cir. 1998).  *See also Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996) (stating that a

33

person has "a clearly established right under the Fourth Amendment not to be arrested unless there [is] probable cause for [the] arrest")).  Because the facts are not established in this case, it is not possible, at this time, to make a determination regarding this factor.

**2.      Unlawful Continued Detention of Nance by Sammis and Evans**

Plaintiffs allege that defendants Sammis and Evans continued to unlawfully detain Nance in violation of the Fourth Amendment (the "continued detention").  Viewing the evidence in the light most favorable to plaintiffs, the court must determine whether the defendants' conduct violated a constitutional right.  *Moore v. Indehar*, 514 F.3d 756, 759 (8th Cir. 2008).

During his deposition, Nance testified as follows:

Q.      Unseld, you testified earlier that at the scene the police officers put handcuffs on you?
A.      Yes.
Q.      And put you by the tree for about 15 minutes; is that correct?
A.      Yes.
Q.      Did you feel like you could leave?
A.      No.
Q.      If you had just walked off, do you think they would have stopped you?
A.      Yes.
Q.      Okay.  You testified also that when you got in the police car that you were - - you still were in handcuffs in the police car?
A.      Yes.
Q.      And you testified that you were there about ten minutes?
A.      Yes.
Q.      Did you feel like you could get out of the police car and walk off?
A.      No.
Q.      Okay.  When you got to the police department and you were sitting on that bench, do you know how long you were sitting on that bench?
A.      No.
Q.      Was it about 30 minutes?

A.      About 20.

Q.      About 20 minutes.  You had the handcuffs on you?

A.      Yes.

Q.      Did you feel like you could leave?

A.      No.

Q.      The officers told you not to talk to your father; is that correct?

A.      No.

. . .

Q.      So - - but you didn't talk to your father the whole time you were in the police department; is that correct?

. . .

A.       No.

Exhibit 3, Nance Dep. p. 47-49, Pltfs.' Am. Resp.  Nance also testified that his father was in the room at the police station with him when he was interviewed.  *See* Exhibit 14, Nance Dep. p. 13, Defs.' Motions.  He indicated that nobody said anything to him that made him feel like he was going to be separated from his parents, nobody threatened him, and he did not feel threatened.  *Id.* at 33.

Evans testified that after he handcuffed Nance, he called the rescue response team, and in "a matter of a minute, maybe," Officer Rains took custody of Nance.  Exhibit 13, Evans Dep. p. 74, Defs.' Motions.  Sammis testified that the first person he saw "show up" was Captain Oaks, and Sammis said to him, "[T]his is yours."  Exhibit 12, Sammis Dep. p. 101, Defs.' Motions.  He further testified that he was "rattled" at that point and could not "direct subordinates at that point."  *Id.*

Nance's father, Unseld Nance, Sr., testified that when he arrived at the scene of the shooting, a female officer told him that his "son was okay," but he could not see him at that point.  Exhibit 4, Nance Sr. Dep. p. 31, Pltfs.' Am. Resp.  After thirty or forty-five minutes,

he asked again, and the female officer gave the same response. *Id.* Fifteen or twenty minutes later, the officer told Nance's father that Nance was at the police station, and took Nance's father to the station. *Id.* When Nance's father arrived at the police station and saw Nance handcuffed, he asked an officer about it, and the officer removed the handcuffs, but told Nance's father that he could not talk to Nance about what just happened. *Id.* at 34. Nance's father was told that they had to wait for the ASP to arrive to give a statement before they left. *Id.* at 37-38. Nance's father testified that he did not recall whether he asked to leave or whether he told anyone that he did not want his son to give a statement. *Id.* at 38-39. Nance's father also testified that the only thing that he felt was threatening in the treatment of his son was the handcuffs. *See* Exhibit 15, Nance Sr. Dep. p. 44, Defs.' Motions.

Taking the facts in a light most favorable to plaintiffs, the encounter between Nance, Farrow, Sammis, and Evans occurred at approximately 10:00 p.m. on June 22, 2007. At the direction of Sammis, Evans handcuffed Nance just after the shooting. The other WMPD officers quickly arrived at the scene, and upon their arrival, relieved Evans of responsibility for control over Nance. Nance was handcuffed for a total of approximately 45 minutes. At approximately 12:30 a.m. on June 23, 2007, the interview of Nance occurred, in the presence of Nance's father, until approximately 1:07 a.m.

Based upon these facts, Evans and Sammis relinquished control of Nance shortly after the arrival of the other WMPD officers. Therefore, it appears that Evans and Sammis cannot be held responsible for the continued detention of Nance beyond that event and are entitled

to qualified immunity as to the continued detention.  Although the continued detention of Nance appears to have been unnecessary and unwarranted, plaintiffs have failed to name any individual responsible for the detention.

### 3.    Supervisor Liability of Paudert and Johnson

That genuine issues of material fact remain as to Sammis' and Evans' liability does not answer whether Chief Paudert and Mayor Johnson are entitled to qualified immunity. To overcome the entitlement to qualified immunity, plaintiffs must allege, and present evidence that could support that Paudert and Johnson violated a well-established constitutional right of plaintiffs.  *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997).

"Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights."  *Id*.  "[A] supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights."  *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996).  Also, "supervising police officials act unconstitutionally in 'failing to adequately receive, investigate, or act upon complaints of [misconduct] by police department employees . . .."  *Id*.

For a supervisor to have violated a plaintiff's constitutional rights by failing to train or supervise, or by failing to adequately receive, investigate, or act upon complaints of misconduct, it must be shown that the supervisor: "(1) Received notice of a pattern of unconstitutional acts committed by subordinates; (2) Demonstrated deliberate indifference

to or tacit authorization of the offensive acts; (3) Failed to take sufficient remedial action; and (4) That such failure proximately caused injury [to the plaintiffs]." *Id.*; *Otey*, 121 F.3d at 1155.

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Otey*, 121 F.3d at 1156 (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). "It is necessary to show 'that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* (quoting *Fowler*, 98 F.3d at 1076 (quotations and citations omitted)). In order to demonstrate deliberate indifference or tacit authorization, the plaintiff must show that "the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Fowler*, 98 F.3d at 1078.

As to direct participation, the *Nance* plaintiffs admit that Paudert and Johnson did not direct the actions of Sammis and Evans on the evening of June 22, 2007. The *Farrow* plaintiffs only contend that the customs, policies, and procedures of the WMPD put in place by Paudert guided the actions of Sammis and Evans that night or that Sammis deviated from those customs, policies, and procedures. The *Nance* plaintiffs admit that Paudert and Johnson did not direct the conduct of the officers who transported Nance to the WMPD at

38

the request of the ASP, and did not direct the actions of any officer or official who had responsibility for the place where Nance was interviewed.  These facts provide no basis upon which to find Paudert or Johnson liable for direct participation in a constitutional violation.

Furthermore, the record is devoid of any basis for imposing liability on Paudert or Johnson for failure to supervise or train Evans, or adequately receive, investigate, or act upon complaints of misconduct by Evans.  Plaintiffs admit that on June 22, 2007, Evans had 687 hours of police training, including training on the use of deadly force.  Plaintiffs submit no evidence of any prior misconduct by Evans.  Thus, there is no basis upon which to find Paudert or Johnson liable for the actions of Evans.

With regard to the claim that Johnson and Paudert failed to train Sammis, defendants submit the training record of Sammis, which reflects 3248 total training hours, including training on the proper use of force, as of the date of the shooting.  *See* Attachment to Exhibit 3, Sammis' Aff., Defs.' Motion.   Although the *Nance* plaintiffs dispute the number of training hours, contending that "Sammis certified himself," the *Farrow* plaintiffs do not dispute the number of training hours.  The portion of Sammis' deposition testimony cited by the *Nance* plaintiffs reflects that Sammis was certified to teach a use of force course by the Commission on Law Enforcement Standards and Training in Arkansas.  Exhibit 1, Sammis Dep. p. 33, Pltfs.' Am. Resp.  Further, Sammis testified that "[y]ou send the actual course material off to get certified," that he prepared the course material that was sent off for certification, and received certification.  *Id*. at 33-35.  He stated that someone must review

39

the information sent off for certification, but did not recall who would have done so in his case. *Id.* at 34. On these facts, the court cannot find that there is any genuine issue of material fact as to plaintiffs' claim that Johnson and Paudert failed to train Sammis.

Regarding plaintiffs' claim of failure to supervise Sammis and adequately receive, investigate, or act upon complaints of misconduct by Sammis, plaintiffs admit that Sammis has never been fired from any job for use of excessive force, although the *Farrow* plaintiffs contend that this is only because the WMPD has been deliberately indifferent to numerous citizen complaints. The *Nance* plaintiffs submit the deposition of Sammis, in which he details the reprimands he has received. Sammis states that while he was working in the narcotics division, he made a traffic stop in which the driver was arrested and the vehicle was towed. Exhibit 1, Sammis Dep. p. 52, Pltfs.' Am. Resp. Sammis found two swords in the trunk of the vehicle, which he took and logged in the upstairs evidence locker in the narcotics division. *Id.* at 52-53. Although it is WMPD policy that the evidence "wind up downstairs" in general lockup, Sammis kept the swords upstairs in the narcotics office until the court date, at which time the swords were returned to the owner and release forms were signed by the owner. *Id.* at 53. The owner filed a complaint with the city attorney, and Sammis testified that he received a letter of reprimand as a result. *Id.*

Sammis also testified that an individual made a claim that Sammis had stolen a necklace, but when the individual "got out of jail and found his necklace in the car," "he recanted it." *Id.* at 52. Sammis further testified that he received letters of reprimand for two

traffic accidents on duty.  *Id*. at 53-54.  He also either received a letter of reprimand or a day of suspension for a comment he made to a captain concerning a uniform violation.  *Id*. at 54.

Sammis testified that Joyce Gray, a former city council member, filed an excessive force complaint regarding the arrest of Ronnie Love during a "buy bust operation," but Ms. Gray did not realize that Sammis was in St. Louis at the time of the incident.  *Id*. at 55.  There is no indication in the record to dispute Sammis' statement and no information regarding the disposition of this complaint.

The *Nance* plaintiffs also assert that Sammis lied about the actions he took while on duty, resulting in his termination from the North Little Rock Police Department.  Review of the portions of Sammis' deposition submitted, however, reveals no discussion of this alleged incident, and the *Nance* plaintiffs provide no other support for the allegation.

Additionally, the *Nance* plaintiffs submit a complaint from *Howard v. Sammis*, 2:04-cv-00095 JLH, a civil case filed in the Eastern District of Arkansas in 2004 alleging excessive force, unreasonable arrest, violations of due process, battery, and false arrest.  In his deposition, Sammis stated that this was an off-duty employment case, in which a "fight broke out" when he and another officer attempted to place an individual under arrest at the racetrack.  Exhibit 1, Sammis Dep. p. 15, Pltfs.' Am. Resp.  Three members of the Howard family were arrested, and subsequently filed suit against Sammis and others.  *Id*. at 15-16.  Sammis testified that the case was settled "against our own wishes."  *Id*. at 17.  Sammis

could not say whether any member of the Howard family filed a complaint with the WMPD against him.  *Id.* at 56.

The *Farrow* plaintiffs submit excerpts of Kathy Howard's deposition, in which she testified that her husband "couldn't get ahold of anybody to let us - - to let them know what he did to us, that's when we decided to sue because we wanted him off the police force." Howard Dep. p. 21, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).  She stated, however, that she did not know whether she was in the room when her husband called, she never called, and there was never a written complaint made to the WMPD.  *Id.* at 24.  She testified that they settled the case, although she regrets doing so.  *Id.* at 21-22.  She also testified that Sammis was "overaggressive," but the submitted excerpts do not set forth the factual allegations by Howard.  *Id.* at 22-23.  The *Farrow* plaintiffs also submit the deposition of defendant Johnson, who testified that he only discussed the *Howard* case with the city attorney at the time of settlement.  Johnson Dep. p. 5, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).

Johnson also stated that he heard the testimony by defendant Paudert that the WMPD does not keep a log of telephonic complaints.  *Id.* at 6.  The Policy and Procedure Manual, however, states, "It is the policy of the Department that all complaints, including those, which are made anonymously, by means of telephone, in writing, or in person, shall be promptly documented and then immediately forwarded to the Chief of Police and the Internal

42

Affairs Commander."  Policy and Procedure Manual, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).

The *Nance* plaintiffs also submit a news article dated August 14, 2008, in which it is alleged that seven cases of police abuse are pending against West Memphis police, and a large number of lawsuits are currently being settled out of court.  Exhibit 9, Article, Pltfs.' Am. Resp.  The *Nance* plaintiffs fail to submit details regarding these cases, including which officers were involved and when the alleged incidents of police abuse occurred.  A news article is not evidence.

The *Farrow* plaintiffs submit portions of Sammis' deposition, in which he testified that there were approximately ten canine biting incidents involving the canine that he controlled.  Sammis Dep. pp. 62-63, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).  Sammis testified that he commanded the canine to bite both felony and misdemeanor suspects involved in those cases.  *Id.*  The *Nance* plaintiffs note that defendant Johnson testified that he abolished the canine patrol in January 1999 because of the number of complaints regarding dog bites, and the *Farrow* plaintiffs provided the referenced deposition pages. Johnson Dep. pp. 21-23, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116)  Johnson testified that three or four people verbally mentioned it to him, and the assistant chief had received some complaints "not about anybody specifically, just the unit."  *Id.* at 22-23.  Johnson testified that he did not know at the time that Sammis was the K9 unit officer, and was not

aware of Sammis' previous history prior to his deposition.  *Id*. at 22, 24.  The *Farrow*

plaintiffs also submit the WMPD Policy and Procedure regarding dog bites, which states:

> DOG BITES:
> In the event a person should be bitten by the K-9, the K-9 officer will file all
> required reports.  A copy of the report shall be submitted to the K-9 supervisor
> for approval, and the supervisor will assure the accuracy of the report and
> submit the report to the Chief of Police.

Policy and Procedure Manual, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).

In *Otey*, the plaintiff presented two pieces of evidence that the police chief had

received notice that the officer who shot him was prone to using excessive force.  121 F.3d

at 1155.  Specifically, the officer "had once fired warning shots to quell a disturbance at a

dance hall, an action that directly violated Elaine Police Department procedure[,]" and an

individual "alleged in an affidavit that her two children had complained of [the officer] using

excessive force and that [the police chief] knew of these complaints."  *Id*. at 1155-56.  The

plaintiff alleged that in neither of these cases did the police chief discipline or counsel the

officer.  *Id*. at 1156.  The Eighth Circuit held that even assuming the allegations were true,

they failed to state a violation by the police chief of the plaintiff's constitutional rights.  *Id*.

The court reasoned that while the officer's use of warning shots was prohibited by the police

department's policy, such action did not put the police chief on notice that the officer

engaged in a pattern of unconstitutional acts because the action "simply did not violate

anyone's constitutional rights."  *Id*.  Moreover, the court stated that the affidavit did not

specify "when excessive force was allegedly used, what the alleged excessive force consisted

of, nor when the complaints of excessive force were allegedly made," and thus, there was no evidentiary support for the allegation that the police chief was on notice of the alleged violations. *Id*.

Here, it is undisputed that Paudert did not hire Sammis, as Sammis was hired before Paudert became Chief of the WMPD. It is also undisputed that defendants Johnson and Paudert are not provided information related to every discipline within the WMPD, nor must they personally approve all discipline at WMPD, as complaints are handled by the internal investigation unit.

As stated above, in order to demonstrate deliberate indifference or tacit authorization, plaintiffs must show that the supervisor defendant had notice that the supervision was inadequate and likely to result in a constitutional violation. *Fowler*, 98 F.3d at 1078. "[A] single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability." *Wever v. Lincoln County*, 388 F.3d 601, 607 (8th Cir. 2004) (quoting *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989)). "[T]his calculus is not rigid, and must change depending on the seriousness of the incident and its likelihood of discovery." *Id*.

Notably, the incidents involving the improper handling of the swords, stolen jewelry, traffic accidents, and uniform violation bear no relation to a claim of excessive force or unlawful detention. Also, plaintiffs have failed to dispute that the allegation of stolen jewelry was made in error and recanted. Furthermore, it appears that almost every verified incident

cited above resulted in some action, either a letter of reprimand or suspension. Plaintiffs have provided insufficient evidence that defendants Johnson or Paudert had notice of the remaining incidents, and in many instances, have failed to provide enough information to determine whether the alleged incidents occurred prior to June 22, 2007. Plaintiffs "may not rely merely on allegations or denials in its own pleading," rather they must "set out specific facts showing a genuine issue for trial." *Moore v. Indehar*, 514 F.3d 756, 757-58 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)(2)).

As to the dog bite complaints, it is undisputed that Johnson abolished the canine patrol based upon said complaints, and thus, plaintiffs cannot demonstrate that he was deliberately indifferent or failed to take sufficient remedial action. Regarding the Howard incident, although Johnson and Paudert likely gained knowledge of the allegations at some point, it is entirely unclear what occurred that evening because the lawsuit was settled, and plaintiffs failed to provide any deposition testimony from Kathy Howard as to the factual allegations. Also, plaintiffs cannot demonstrate defendants Johnson and Paudert failed to act upon complaints of misconduct because it is undisputed that no written complaint was ever made with the City of West Memphis or the WMPD, and there is insufficient evidence that even a verbal complaint was made.

A supervisory official may also be liable if he created a policy or custom under which the unconstitutional practice occurred. *See Brown v. Missouri Dept. of Corrections*, 353 F.3d 1038 (8th Cir. 2004); *Lansdown v. Chadwick*, 152 F. Supp. 2d 1128, 1146 (W.D. Ark. 2000),

46

*aff'd*, 258 F.3d 754 (8th Cir. 2001) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).  As discussed below, plaintiffs have failed to present sufficient evidence of a policy or custom.  Therefore, defendants Paudert and Johnson are entitled to summary judgment as to plaintiffs' section 1983 excessive force and unlawful detention/arrest claims.

**B.    Motion for Summary Judgment by Separate Defendant City of West Memphis (Doc. No. 44) and Motion for Summary Judgment (Doc. No. 78)**

In order to hold the City of West Memphis liable under section 1983, a plaintiff must establish that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's officers]," or that a "constitutional deprivation [was] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Marchant v. City of Little Rock*, 741 F.2d 201, 204 (8th Cir. 1984) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978)).

"Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy."  *Ware v. Jackson County, Mo.*, 150 F.3d 873, 880 (8th Cir.1998).  "Alternatively, liability may be established through proof that the alleged misconduct was so pervasive among the non-policy making employees of the municipality as to constitute a 'custom or usage' with the force of law."  *McGautha v. Jackson County, Mo., Collections Dept.*, 36 F.3d 53, 56 (8th Cir. 1994).  "This standard serves to prevent municipal evasion of liability through improper delegation of policy

responsibility or acquiescence in pervasive constitutional violations by [] employees." *Id.* at 56-57.

"'[C]ustom or usage' is demonstrated by: (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation." *Ware*, 150 F.3d at 882. "Liability for an unconstitutional custom or usage, however, cannot arise from a single act. " *McGautha*, 36 F.3d at 57 (citing *Wedemeier v. City of Ballwin,* 931 F.2d 24, 26 (8th Cir. 1991) ("a single deviation from a written, official policy does not prove a conflicting custom or usage"); *Williams-El v. Johnson,* 872 F.2d 224, 230 (8th Cir. 1989) (one occurrence of improper prison guard hiring contrary to official written policy does not prove the existence of a conflicting custom or usage)).

With regard to the use of deadly force, defendants submit portions of the WMPD Policy and Procedures Manual, which provides, in part:

> 7: <u>Deadly Force</u>:  Any force that when used can cause death or serious bodily injury.  This is a last resort and only used when an officer perceives the threat of death or serious bodily injury is present and imminent against himself or third party.  This in no way restricts the immediate escalation from a lower stop in the continuum to the "Deadly Force" step if justified and warranted for

48

safety.  All officers will adhere to the West Memphis Police Department "Deadly Force" policy. (Chapter 7- Section 2)[7]

. . .

SECTION: Deadly Force

The following policy will govern the use of deadly force and the investigative procedures thereof:

1: Definitions:

    a.    Violent Felony – A felony in which the suspect has used, or threatened to use, force that will cause death or serious bodily injury.

    b.    Deadly Force – The amount of force that is sufficient to, intended to, or may be reasonably expected to inflict serious bodily injury and/or death.  This includes the discharge of any firearm at, near, or in the direction of any individual.[8]

    c.    Juvenile – Any person under the age of eighteen (18) years.

---

[7] The *Farrow* plaintiffs submit a copy of WMPD Policy and Procedures, which provides a slightly different version of this paragraph:

    7: <u>Deadly Force</u>: Physical force that under the circumstances in which it is used is readily capable of causing death or serious physical injury (5-2-601 (5)).  This is the last resort and only used when an officer perceives the threat of death or serious bodily injury is present and imminent against himself or a third party.  This in no way restricts the immediate escalation from a lower step in the continuum to the "Deadly Force" step if justified and warranted for safety. All officers will adhere to the West Memphis Police Department "Deadly Force" policy.

Policy and Procedure Manual, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).

[8] The *Farrow* plaintiffs submit a copy of WMPD Policy and Procedures, which defines "Deadly Force" as "Physical force that under the circumstances in which it is used is readily capable of causing death or serious physical injury (5-2-601(5)).  Policy and Procedure Manual, Exh. to *Farrow* Stmt. of Facts (Doc. No. 116).

d.      Probable Cause – Facts and circumstances known to a reasonable and prudent police officer, which lead him to reasonably conclude that a crime has been committed and the suspect, committed it. Probable cause exists when facts and circumstances within an officer's knowledge, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been, or is being, committed. Probable cause is such belief as would appear reasonable to the ordinary and prudent police officer of similar experience under like circumstances. Such belief is not reasonable if the officer is reckless or negligent in having such belief or in acquiring or failing to acquire any knowledge or belief of fact or of law which is material to the justifiability of his use of force.

e.      Exhaustion of All Other Reasonable Means – All other reasonable means have been exhausted when an officer has tried to control conflict by using all alternate methods other than deadly force; however, all other reasonable means may be considered to have been exhausted when an officer analyzes a set of circumstances and honestly and reasonably concludes that any other means will be ineffective, useless, or hazardous to the officer or some innocent third party. In order to qualify as having exhausted all other reasonable means, the officer must be able to show that his/her use of deadly force was <u>IMMEDIATELY</u> necessary. The officer must also have communicated his identity and purpose to the suspect, unless these facts are already known by the suspect or cannot REASONABLY be made known to the suspect under the circumstances.

Where feasible, warning should be given the suspect by identifying himself/herself as an officer, or by an oral order to halt, or by an oral warning that deadly force might be used. In deciding whether the use of deadly force is reasonably necessary, the officer must consider whether other action could eliminate the immediate need for deadly force.

2. Use of Deadly Force Authorized:

Officers shall use only the minimum amount of force, which is consistent with the accomplishment of their duties and must exhaust every other reasonable means of prevention, apprehension, or defense before resorting to the use of deadly force.

Pursuant to state law, deadly force may be used in the following circumstances, <u>AFTER ALL OTHER REASONABLE MEANS OF APPREHENSION OR PREVENTION HAVE BEEN EXHAUSTED</u>:

      a.      In self defense where the officer has been attacked with deadly force; is being threatened with the use of deadly force; or where the officer has probable cause and reasonably perceives an immediate threat of deadly force.

      b.      In defense of others where a third party has been attacked with deadly force; is being threatened with the use of deadly force; is in danger of serious bodily injury or death during the actual commission of a crime against his/her person; or where the officer has probable cause and reasonably perceives an immediate threat of deadly force to a third party.

      c.      To prevent the commission of a violent felony in progress.

. . .

      e.      If the officer has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or to others unless he/she is immediately apprehended.

. . .

3.  Use of Deadly Force Prohibited:

The use of deadly force is prohibited in the following circumstances:

      a.      To apprehend or arrest a person for a misdemeanor offense.

. . .

      d.      To apprehend or arrest a person known to be or believed to be a juvenile, unless the use of deadly force is immediately necessary in the defense of the officer's life or of another person's life when all other reasonable means have been exhausted.  The officer's knowledge or belief of a person's age may be based upon factors such as the officer's previous knowledge of the person, his/her observations of the person's

51

> appearance, or upon reliable information given to him/her by other persons.

. . .

USE OF FORCE CONTINUUM

> The Use of Force Continuum is considered a step process in a series of control techniques that officers have at their disposal to bring a suspect under control. The Use of Force Continuum shall not restrict an officer's ability and means to bring a suspect under control, to protect themselves or a third party as it relates to their perception of the immediate situation. However, a certain and specific level of control or technique should be used with the minimum amount of force necessary.

. . .

> There is no requirement or constitutional duty that police officers use all feasible alternatives to avoid a situation or to use non-deadly or less lethal alternatives first where deadly force can be justifiably used. (Plakas v. Drinski, U.S. Supreme Court)

*See* Attachment to Exhibit 2, Paudert's Aff., Defs.' Motions. Plaintiffs do not set forth any arguments, and the court cannot say, that this policy is unconstitutional.

"To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action." *Fowler*, 98 F.3d at 1075. Here, there is no evidence that the city was deliberately indifferent to complaints of excessive force or unlawful detention on the part of any officer, much less the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the city's employees that amounts to a city custom or policy of overlooking police misconduct. *Id*. at 1076. As discussed above, it appears that almost every verified incident cited by plaintiffs resulted in some action, either a letter of reprimand or suspension. Plaintiffs have provided insufficient

evidence that the City of West Memphis had notice of several incidents, and in many instances, have failed to provide enough information to determine whether the alleged incidents occurred prior to June 22, 2007.  Also, as discussed above, plaintiffs cannot demonstrate deliberate indifference or failure to take remedial measures as to the dog bite complaints, and have failed to adequately set forth support for factual allegations or any complaints made regarding the Howard incident.  Furthermore, plaintiffs have failed to demonstrate the initial or continued detention implements or executes a policy or was visited pursuant to a custom of the WMPD, and failed to name any individual responsible for the continued detention of Nance.  Plaintiffs "may not rely merely on allegations or denials in its own pleading," rather they must "set out specific facts showing a genuine issue for trial." *Moore*, 514 F.3d at 757-58 (citing Fed. R. Civ. P. 56(e)(2)).  Thus, the City of West Memphis cannot be held liable under section 1983 for either the initial or continued unlawful detention or excessive force based on a theory of failure to investigate and prevent misconduct.

"A city also may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the failure to train reflects a deliberate or conscious choice by a municipality; and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury. *Fowler*, 98 F.3d at 1076.  Plaintiffs have presented no evidence that the training of WMPD officers was deficient.  Additionally, as discussed above, plaintiffs' claims regarding failure to train

against defendants Johnson and Paudert fail, as defendants Sammis and Evans were adequately trained.  Plaintiffs have failed to establish that the City of West Memphis had deficient policies or customs regarding hiring and training police officers, or that any alleged deficiency caused plaintiffs' injuries.  Thus, the City of West Memphis cannot be held liable under section 1983 for either the initial or continued unlawful detention or excessive force due to hiring or training.

**C.      Pendent State Claims**

The *Nance* plaintiffs assert violations of the Arkansas Civil Rights Act, wrongful detention, unlawful arrest, unreasonable seizure, unlawful search, assault and battery, false imprisonment, intentional infliction of emotional distress, gross negligence, and negligence. The *Farrow* plaintiffs assert violations of the Arkansas Civil Rights Act, wrongful death, false arrest, false seizure, assault and battery, gross negligence, and negligence.

**1.      Arkansas Civil Rights Act**

Plaintiffs bring claims under the Arkansas Civil Rights Act.   Arkansas Code Annotated § 16-123-105 provides:

> (a) Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the party injured in an action in circuit court for legal and equitable relief or other proper redress.
> . . .
> (c) When construing this section, a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871, as amended

and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which
decisions and act shall have persuasive authority only.

The Arkansas Supreme Court has held that "Article 2, § 15, of the Arkansas Constitution is

virtually identical to the Fourth Amendment," and thus has interpreted "it in the same manner

as the United States Supreme Court interprets the Fourth Amendment." *Rainey v. Hartness*,

339 Ark. 293, 300, 5 S.W.3d 410, 415 (Ark. 1999).   Therefore, the court's findings with

respect to plaintiffs' claims under 42 U.S.C. § 1983 also apply with respect to plaintiffs'

claims under the Arkansas Civil Rights Act.

### 2.     Assault and Battery

Defendants assert that plaintiffs' claims for assault and battery fail because both

require the intent to injure.  Defendants further assert that there is no proof that either officer

who encountered Nance on June 22, 2007, had any intent to create an apprehension of

harmful or offensive contact or that harmful or offensive contact occurred and that was the

officers' intent.   Neither the *Nance* nor *Farrow* plaintiffs directly address defendants'

assertions.  The court notes that the affidavits of Sammis and Evans only state that they had

no intent to inflict emotional distress on any of the plaintiffs.  Based upon the facts submitted

in this case, as discussed above, the court cannot grant summary judgment as to the assault

and battery claims.

### 3.    False Imprisonment[9]

Defendants assert that plaintiffs' claims of false seizure, arrest, and imprisonment fail because they had probable cause. *Mendenhall v. Skaggs Cos.*, 285 Ark. 236, 238, 685 S.W.2d 805, 806 (1985) ("[P]robable cause is a defense to a civil action for false arrest or false imprisonment in connection with a misdemeanor."). As discussed above, the facts do not clearly establish that the officers had probable cause, and therefore, summary judgment is denied.

### 4.    Wrongful Death, Negligence, and Gross Negligence

Defendants assert that plaintiffs' claims on the basis of negligence, including wrongful death, are without merit because city employees are "immune from suit for torts occasioned by any negligent act they may commit in the performance of their official duties." *Matthews v. Martin*, 280 Ark. 345, 345-46, 658 S.W.2d 374, 375 (1983) (distinguishing the suit from "one where a public official or employee is sued individually for a violation of a duty imposed upon that individual by law in common along with all other people"). Arkansas Code Annotated § 21-9-301 provides:

> (a) It is declared to be the public policy of the State of Arkansas that all . . . municipal corporations . . . and other political subdivisions of the state and any of their . . . agencies . . . shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.

---

[9] "False imprisonment and false arrest are used interchangeably in most courts. Technically, however, a false arrest is merely one type of false imprisonment; namely, when an arrest occurs under the pretense of legal authority." Howard W. Brill, *Arkansas Law of Damages*, § 33:3 (5th ed. 2004)

(b) No tort action shall lie against any such political subdivision because of the acts of its agents and employees.

Plaintiffs do not specifically address defendants' argument.

In *Davis v. Fulton County*, 884 F. Supp. 1245, 1262 (E.D. Ark. 1995), this court held that Arkansas Code Annotated § 21-9-301 provided the defendants "with immunity for all covered claims brought against them in their individual capacities, as the[] defendants [were] alleged to have violated a duty of care imposed upon them only by virtue of their official positions (as opposed to a duty that is generally applicable to society as a whole)." The court reasoned that "while the pleading distinction between 'official capacity' liability and 'individual capacity' liability remains relevant in § 1983 actions alleging official misconduct by public officials, this distinction is of no moment when determining the scope of the immunity afforded by § 21-9-301 in any analogous tort actions." *Id.* at 1262 n.22. *See also Davis v. Fulton County*, 90 F.3d 1346, 1353 (8th Cir. 1996) (affirming the district court's ruling on this issue).

Here, it appears that the defendants were performing official city functions at the time of the incident, and are alleged to have violated a duty of care imposed upon them only by virtue of their official positions. Defendants are entitled to statutory immunity for the state law claims of negligence and wrongful death based on a theory of negligence, as defendants state that the City of West Memphis maintains no insurance covering the state law negligence claims asserted. Plaintiffs' claims of gross negligence remain, however, as it is not clear that the statutory immunity provision applies to such claims. *See Doe v. Baum*, 348 Ark. 259,

278, 72 S.W.3d 476, 487 (Ark. 2002) (noting that *Black's Law Dictionary* defines "gross negligence" as "[t]he intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another"); *Spence v. Vaught*, 236 Ark. 509, 512-13, 367 S.W.2d 238, 240 (Ark. 1963) ("Gross negligence is the failure to use even slight care."). To the extent the *Farrow* plaintiffs can proceed with a wrongful death claim based upon gross negligence, that claim also survives.

### 5.     Intentional Infliction of Emotional Distress

As to plaintiffs' claims of intentional infliction of emotional distress, "[t]o establish a claim for the tort of outrage, a plaintiff must demonstrate the following elements: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency,' and was 'utterly intolerable in a civilized community;' (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it." *Marlar v. Daniel*, 368 Ark. 505, - - S.W.3d - - (2007) (citing *Crawford v. Jones*, 365 Ark. 585, - - S.W.3d - - (2006)).

Here, the *Nance* plaintiffs admit that none of the separate defendants had the intent to inflict emotional distress on any of the plaintiffs. *Nance* Stmt. of Facts at ¶ 40. It is unclear, however, whether the *Nance* plaintiffs can demonstrate that defendants "knew or should have known that emotional distress was the likely result" of the conduct. The *Farrow*

58

plaintiffs dispute defendants statement that none of the separate defendants had the intent to inflict emotional distress on any of the plaintiffs. *Farrow* Stmt. of Facts at ¶ 37. Taking the facts in light most favorable to plaintiffs, summary judgment is not appropriate at this time as to plaintiffs' claims of intentional infliction of emotional distress.

**D.    Other Claims Not Addressed on Summary Judgment**

**1.    Conspiracy to Deprive Civil Rights Claims**

In their complaints, both the *Nance* and *Farrow* plaintiffs state general 42 U.S.C. § 1985(3) allegations, and also cite 42 U.S.C. § 1986.[10]  To prove a § 1985(3) claim, a complaint must allege that the defendants did (1) conspire; (2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;" and (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of [the] conspiracy," whereby another was (4a) "injured in his person or property" or (4b) "deprived of having and exercising any right or privilege of a citizen of the United States." *Fowler*, 98 F.3d at 1079.  "The plaintiff must show that the conspiracy is fueled by some "class-based, invidiously discriminatory animus." *Id*.  "Additionally, to succeed on a civil rights conspiracy claim, the plaintiff must demonstrate discriminatory purpose in that the defendants selected the particular course of action 'because of' not merely 'in spite of' its adverse effects upon an identifiable group." *Id*. at 1080.

---

[10]  The court notes that plaintiffs also cite 42 U.S.C. § 1988, which is the provision regarding the applicability of statutory and common law and attorney's fees.

"Title 42 U.S.C. § 1986 provides a cause of action against '[e]very person who, having *knowledge* that any of the wrongs conspired to be done, and mentioned in section 1985 of . . . [T]itle [42], are *about to be committed,* and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do so, if such wrongful act be committed.'" *Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) (quoting *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992)).  "Liability under § 1986 is dependent on proof of actual knowledge by a defendant of the wrongful conduct." *Id.* (internal quotations omitted).  In order to maintain a section 1986 action, plaintiffs must prove that: "(1) [the defendant] had actual knowledge of a § 1985 conspiracy, (2) [the defendant] had the power to prevent or aid in preventing the commission of a § 1985 conspiracy, (3) [the defendant] neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Id.*  "[F]irsthand knowledge is not required under § 1986. The courts have nevertheless required 'actual knowledge.'" *Id.*  "[R]ecovery under section 1986 is dependent on the existence of a claim under section 1985." *McIntosh v. Arkansas Republican Party-Frank White Election Committee*, 766 F.2d 337, 340 (8th Cir. 1985).

In their response to defendants' statement of facts, the *Nance* plaintiffs admit that none of the separate defendants' material actions alleged in this case were motivated by racial animus or other unconstitutional motives. *Nance* Stmt. of Facts at ¶ 57.  Therefore, it appears that the *Nance* plaintiffs have abandoned these claims.  In their response to defendants' statement of facts, however, the *Farrow* plaintiffs state that this is a jury

question, but they provide no support for this assertion.  Neither the defendants nor the plaintiffs, however, discuss these claims in their briefs.  Therefore, the court declines to dismiss these claims at this time.

### 2.      Equal Protection

Similarly, because the *Nance* plaintiffs admit that none of the separate defendants' material actions alleged in this case were motivated by racial animus or other unconstitutional motives, it appears that they have abandoned their equal protection claims. *Fowler*, 98 F.3d at 1079 (finding that plaintiff's claim did not implicate equal protection because plaintiff made no showing that the alleged failure to investigate was on account of her gender).  Because neither party has discussed this claim in their briefs, the court declines to dismiss the equal protection claim at this time.

### 3.      Individual Claims by Unseld Nance, Sr., Pamela Farrow, Debra Farrow, and Robin Perkins

In their complaint, the *Farrow* plaintiffs assert that "Debra Farrow and Robin Perkins had the constitutional right to have the association of their son, to direct the education of their son, and to enjoy the love and affection of their son," and "have the clearly established First Amendment right to have the unabridged association of their son as well as other personal rights thus guaranteed in their role as parents."  In their complaint, the *Nance* plaintiffs allege that Unseld Nance, Sr. "was denied his right to custody of his son and forced to remain at the West Memphis Police Station until the Arkansas State Police arrived" and "sustained a constitutional injury pursuant to the unlawful threat of separation from his son."  They also

61

allege that Pamela Farrow "had the right to have parented her son undamaged by the defendants conduct."  The *Nance* plaintiffs also vaguely assert a First Amendment claim.

The Eighth Circuit has "recognized a right to familial relations, which includes the liberty interest of parents in the custody, care, and management of their children."  *King v. Olmsted County*, 117 F.3d 1065, 1067 (8th Cir. 1997) (citing *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1370-71 (8th Cir.1996) (quoting *Manzano v. South Dakota Dep't of Soc. Servs.,* 60 F.3d 505, 509-11 (8th Cir.1995))).  Several courts, however, have held that it is a "well-settled principle that a section 1983 claim must be based upon the violation of plaintiff's personal rights, and not the rights of someone else."  *See, e.g.*, *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990) (holding that son had no liberty interest to be free of emotional trauma suffered as a result of observing allegedly excessive police force which was directed entirely at his father); *Coon v. Ledbetter,* 780 F.2d 1158, 1160-61 (5th Cir. 1986) (holding that a wife who witnessed sheriff's deputies shooting in her mobile home and wounding her husband had no constitutional claim for emotional injuries); *Trujillo v. Bd. of County Comm'rs,* 768 F.2d 1186 (10th Cir. 1985) (rejecting the claim by a mother and daughter against various public officials that the wrongful death of their son and brother while incarcerated in a county jail deprived them of their constitutional right of familial association because there was no showing that the jailers directed any activity toward the familial relationship with an intent to interfere with that relationship).

In *Reasonover v. St. Louis County*, 447 F.3d 569, 585 (8th Cir. 2006), the Eighth Circuit stated that "[a] defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship." There, the Eighth Circuit held that plaintiff could not support her claim that defendants violated her right to familial association as a result of her incarceration because she "presented no evidence that the defendants had the intent to interfere with the relationship" between plaintiff and her daughter. *Id.* The court further held that even if plaintiff had presented such evidence, "any right to familial association was not sufficiently clear such that the defendants reasonably could have understood they were violating it" because neither the Supreme Court nor the Eighth Circuti "has clearly held wrongful prosecution and incarceration of a family member violates a right to familial association." *Id. See also Harpole v. Ark. Dep't of Human Servs.*, 820 F.2d 923, 927-28 (8th Cir. 1987) (overruled on other grounds) ("Protecting familial relationships does not necessarily entail compensating relatives who suffer a loss as a result of wrongful state conduct, especially when the loss is an indirect result of that conduct."); *Helleloid v. Indep. Sch. Dist. No. 361*, 149 F. Supp. 2d 863, 873-74 (D. Minn. 2001).

On this basis, the court has some doubt as to the ability of plaintiffs to pursue these claims. Additionally, because no defendants remain as to the continued detention of Nance, the court doubts whether the claims of Nance's parents can survive since the initial detention appears to have occurred over a short period of time, and Nance's parents were likely not

present during the initial detention.  Furthermore, the court questions whether the parents' claims against the City of West Memphis, Johnson, and Paudert fail if the City of West Memphis, Johnson, and Paudert are not liable for any of the underlying alleged constitutional deprivations.  Because these issues have not been addressed on summary judgment, however, the claims of the parents of Nance and Farrow remain.

### 4.    Unknown Arkansas State Police Officers

As discovery in this case is closed, and it appears that plaintiffs have failed to properly identify and serve the unknown Arkansas State Police Officer defendants, dismissal of these defendants is likely warranted.  Fed. R. Civ. P. 4(m).  Additionally, as plaintiffs have only named the unknown Arkansas State Police Officers in their official capacities, these claims are actually against the State of Arkansas.  Thus, it appears that plaintiffs claims against the unknown Arkansas State Police officers are "tantamount to a suit against the state" and are barred by sovereign immunity.  *See Simons v. Marshall*, 369 Ark. 447, 451, 255 S.W.3d 838, 841-42 (2007).  Once again, this issue was not addressed on summary judgment, but the court will entertain pre-trial motions as to the unknown Arkansas State Police Officers.

### VI.  CONCLUSION

As to the *Nance* plaintiffs, their claims pursuant to 42 U.S.C. § 1983 with regard to excessive force and the initial unlawful detention/arrest, and parallel Arkansas Civil Rights Act claims, against Sammis and Evans survive.  The excessive force and unlawful detention section 1983 claims, and parallel Arkansas Civil Rights Act claims, against the City of West

Memphis, defendant Johnson, and defendant Paudert are dismissed.  The state law assault and battery claim, false imprisonment claim, the intentional infliction of emotional distress claim, and gross negligence claim survive summary judgment, but the negligence claim is dismissed.  Defendants failed to address the *Nance* plaintiffs' conspiracy claim pursuant to 42 U.S.C. § 1985(3), and related 42 U.S.C. § 1986 claim, equal protection claim, and the individual claims of Nance's parents, and thus, these claims remain.

As to the *Farrow* plaintiffs, their claims pursuant to 42 U.S.C. § 1983 with regard to excessive force and the initial unlawful detention/arrest, and parallel Arkansas Civil Rights Act claims, against Sammis and Evans survive.  The excessive force and unlawful detention section 1983 claims, and parallel Arkansas Civil Rights Act claims, against the City of West Memphis, defendant Johnson, and defendant Paudert are dismissed.  The state law assault and battery claim, false imprisonment claim, intentional infliction of emotional distress claim, and gross negligence claim, including any cognizable wrongful death claim based upon gross negligence, survive summary judgment, but the negligence claim is dismissed. Defendants failed to address the *Farrow* plaintiffs' conspiracy claim pursuant to 42 U.S.C. § 1985(3), and related 42 U.S.C. § 1986 claim, equal protection claim, and the individual claims of Nance's parents, and thus, these claims remain.

Accordingly, the individual defendants' motion to exclude testimony of plaintiffs' expert (Doc. No. 87) is granted.  The motion for summary judgment filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 38)

65

and supplement (Doc. No. 82); and the motion for summary judgment on the basis of qualified immunity filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 40) and supplement (Doc. No. 83); filed with regard to the *Nance* case are granted in part, and denied in part, as stated herein.  The motion for summary judgment filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 75); and the motion for summary judgment on the basis of qualified immunity filed by separate defendants Sammis, Evans, Johnson, and Paudert, in their individual capacities (Doc. No. 80); filed with regard to the *Farrow* case are granted in part, and denied in part, as stated herein.  The motions for summary judgment filed by separate defendant the City of West Memphis (Doc. Nos. 44 and 78) with regard to the *Nance* and *Farrow* cases are granted as stated herein.

IT IS SO ORDERED THIS 5th day of February, 2009.

UNITED STATES DISTRICT JUDGE